JINA L. CHOI (NY Bar No. 2699718)
SUSAN F. LA MARCA (Cal. Bar No. 213251)
 lamarcas@sec.gov
DAVID S. JOHNSON (D.C. Bar No. 477298)
 johnsonds@sec.gov
DAVID A. BERMAN (NY Bar No. 4334884)
 bermand@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500 (telephone)
(415) 705-2501 (fax)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| ANDREW M. MILLER, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges:

## SUMMARY OF THE ACTION

1.      Defendant Andrew M. Miller ("Miller" or "Defendant"), the former Chief Executive Officer ("CEO") of Polycom, Inc. ("Polycom"), engaged in a long-running scheme to surreptitiously use Polycom funds to pay for his personal expenses, including lavish meals, foreign and domestic travel, clothing, gifts and entertainment for himself, and his relatives and friends. From approximately 2010 until his resignation as CEO on July 19, 2013, Miller falsified, and caused others to falsify, business records in order to hide his scheme, and thus evaded the requirement that he and Polycom tell investors about such perquisites ("perks").

2.      As Miller knew, and as required by the federal securities laws, Polycom made detailed public disclosures in statements and reports filed annually with the Commission about the perks it awarded to top executives, including the CEO, in addition to the other compensation it paid them. During his time at Polycom, Miller solicited investors for their proxies to vote on corporate resolutions, including on his own compensation and his election as a director, by using materials that included these executive compensation disclosures, which he signed.  Miller also certified filings with the Commission that incorporated these disclosures by reference.  But Miller knew that the executive compensation disclosures were false and misleading, as they omitted hundreds of personal expenses, many of which he had obtained by false pretenses, and he went to great lengths to make sure they were not discovered.

3.      As part of his scheme, Miller repeatedly fabricated expense reports, or directed one or more of his administrative assistants to prepare false and misleading reports, to create the false impression that the payments he sought from Polycom were for "business" expenses rather than personal charges.  Miller perpetrated his scheme by, among other things: using false names of purported Polycom business partners as his guests at entertainment events that Miller actually attended with his family and friends; claiming to donate expensive items to charitable organizations on Polycom's behalf, while Miller actually gave the items to his family and friends or kept them for himself; and expensing ornate gifts, which he claimed he would use to reward high-performing sales people or give to Polycom clients on Polycom's behalf, but which he never gave them.

4.      Indeed, prior to his resignation on July 19, 2013, when confronted by Polycom's Audit Committee about his scheme, Miller admitted that he had used company funds for his personal expenses, that he had submitted false expense reports, and that his conduct was inappropriate.

5.      Miller thus obtained perks from Polycom in the amount of at least $190,000 that were not disclosed to investors.  Accordingly, Miller violated and, unless restrained or enjoined, will again violate the anti-fraud, proxy solicitation, periodic reporting, books and records and internal controls provisions of the federal securities laws, and falsely certified Polycom's public filings in violation of SEC rules.

**JURISDICTION AND VENUE**

6.      The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), & 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d),  78u(e), & 78aa.

7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), & 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), & 78aa.

8.      Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

9.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), as acts and practices constituting the violations of the securities laws occurred in this district, and Defendant transacted business in this district, including his participation in the offer or sale of securities of Polycom, Inc.

10.     Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco County.

**THE DEFENDANT**

11.     **Andrew M. Miller**, age 55, is currently a resident of Miami, Florida.  From May 2010 to July 19, 2013, when he resigned, Miller was the President and Chief Executive Officer of Polycom, Inc.  From June 2010 to July 19, 2013, Miller was also a member of Polycom's Board of Directors.  During the entire time that Miller was CEO of Polycom, he resided in San Francisco, California.  From January 2010 to July 19, 2013, Miller was paid approximately $24 million in total disclosed compensation by Polycom, the large majority of which was in the form of Polycom stock and options.  From July 2009 to May 2010, Miller was Polycom's Executive Vice President of Sales.

**RELEVANT ENTITY**

12.     **Polycom, Inc.** is a Delaware corporation with its principal place of business in San Jose, California.  Until April 2012, Polycom's principal place of business was in Pleasanton,

California.  Polycom sells communications technology, and it has issued common stock that is
registered under Section 12(b) of the Exchange Act, 15 U.S.C. § 78*l*(b), which, at all times relevant to
this complaint, was quoted on the Nasdaq Global Select Market under the ticker symbol "PLCM."

<b><u>FACTS</u></b>

**A.      <u>Miller's Expense Abuse Scheme</u>**

13.      Beginning in approximately January 2010, Miller embarked on a long-running scheme
in which he submitted, or directed others to submit on his behalf, to Polycom requests for
reimbursement for his personal expenses, falsely claiming that they were business expenses.  Miller
continued in the scheme throughout his tenure as CEO, until his resignation on July 19, 2013.

14.      Miller thus sought and obtained reimbursement from Polycom for various types of
personal expenses, including meals with his friends and family at upscale restaurants and catered
meals; air travel for personal vacations and weekend getaways; fashion and accessories, particularly
men's dress shirts from high-end retailers; spa treatments; tickets to baseball games, the theatre, and
other entertainment; luxury hotels; limousine services; and numerous other purchases for himself and
his San Francisco apartment.

15.      Miller accomplished the scheme in several ways.  The first involved Miller's use of a
credit card Polycom had obtained for him to use for business expenses.  Miller regularly used his
Polycom credit card to charge personal expenses, and then sought and obtained reimbursement from
Polycom for these charges by submitting, or causing one or more of his administrative assistants to
submit, expense reports with fabricated business descriptions.

16.      For example, on February 23, 2011, Miller charged $342.70 to his Polycom credit card
at the Hook restaurant in Washington, D.C.  Miller hand-wrote on the meal receipt the names of five
individuals with whom he purportedly dined, identifying them as employees of a Polycom customer,
and he submitted, or directed his administrative assistant to submit, an expense report describing the
meal as a "Customer Meeting."

17.      But Miller's description of the February 23, 2011 meal was false, as he had actually
eaten and paid for dinner at Hook with his brother and certain other family members, none of whom
were Polycom customers.  Emails from Miller's brother to Miller reveal that Miller's brother actually

1   made the dinner reservation at Hook and then thanked Miller for the dinner two days later. Pursuant

2   to his false description, Miller was reimbursed for this personal meal expense by Polycom.

3       18.     In another instance, on May 9, 2012, Miller charged $524.67 (£316.66) to his Polycom

4   credit card at Thomas Pink, a men's clothing boutique at Heathrow Airport, in London, England.

5   Miller again hand-wrote certain names on the receipt, along with the words "Q2 gift," and later

6   emailed his administrative assistant, who was preparing an expense report at his direction, claiming

7   that the purchase was for a Polycom partner.

8       19.     But Miller's description of the May 9, 2012 purchase at Thomas Pink was false, as

9   Miller's own emails reflect that he had purchased Thomas Pink dress shirts to wear himself. Pursuant

10  to his false description, Miller was reimbursed for this personal clothing expense by Polycom.

11      20.     In another set of instances, from February 22, 2012 to March 8, 2012, Miller charged

12  more than $2,000 to his Polycom credit card for a spa gift certificate from the Four Seasons, designer

13  sunglasses, Hermes ties and Thomas Pink dress shirts at stores in London, England; Houston, Texas;

14  Melbourne, Australia; and Washington, D.C. Miller emailed his administrative assistant, who was

15  preparing an expense report at his direction, and told her that the purchases were retirement gifts for

16  Polycom's then-outgoing Chief Financial Officer ("CFO").

17      21.     But Miller's descriptions for the February 22-March 8, 2012 expenses were false, as

18  the outgoing CFO never received the purported gifts. Because of his false description, Miller was

19  reimbursed for these personal expenses by Polycom.

20      22.     In another instance, on December 7, 2012, Miller charged $667.02 to his Polycom

21  credit card at Quince, a four-star restaurant in San Francisco, California. The next month, while

22  preparing his expense report, Miller's administrative assistant emailed Miller to ask him for a

23  description of the December 7, 2012 meal. Miller responded via email with the names of purported

24  business guests and a purported business description, which his assistant added to the expense report.

25      23.     But Miller's description of the December 7, 2012 meal was false, as he had actually

26  eaten and paid for dinner at Quince with his girlfriend and parents, who were visiting San Francisco.

27  Indeed, Polycom's records reflect that Miller arranged for a limousine service to pick up his parents

28  from their hotel, bring them to the restaurant, and wait for them outside during the dinner, costing

1    more than $380, which Miller also charged to Polycom.  Pursuant to his false description, Miller was

2    reimbursed for this personal meal expense by Polycom.

3         24.    Among the other means Miller used to obtain reimbursement from Polycom for his

4    personal expenses was through the use of company purchasing cards, which Polycom called "P-

5    Cards," that were used by Miller's administrative assistants.  Polycom arranged for P-Cards to be

6    issued to employees who might need to charge business expenses but who did not have company-

7    affiliated credit cards, including administrative assistants.

8         25.    Under Polycom's internal policy, Miller was responsible for reviewing and approving

9    (or denying) his administrative assistants' P-Card charges.  Miller directed his assistants to pay for

10   his personal charges on their P-Cards, and provided them with false business justifications to record

11   as support.

12        26.    For example, on July 17, 2012, Miller emailed his administrative assistant and directed

13   her to buy him "the two best" tickets to a San Francisco production of the musical *Les Miserables*,

14   explicitly instructing her to put the charge on her P-Card.  The subject line of Miller's email indicated

15   that the purchase was for the "University of California SF/Childrens Hospital" on behalf of another

16   prominent Bay Area executive.  Pursuant to the instruction, Miller's administrative assistant charged

17   $413.40 to her P-Card for two tickets to the show, and submitted the expense for reimbursement with

18   the description that Miller had provided.

19        27.    But Miller's description of the expense was false, as he used the tickets to attend the

20   theatre with his girlfriend, and did not make a gift of the tickets to the Children's Hospital on behalf

21   of the executive or anyone else.

22        28.    In another similar instance, on July 7, 2012, Miller directed his administrative assistant

23   to buy him two tickets to an August 3, 2012 performance of the Broadway musical *Jersey Boys* in

24   New York City.  On July 24, 2012, Miller emailed his administrative assistant to ask if she had the

25   tickets, and during that exchange he represented, "I am giving the JB tickets as a prize in a NYC

26   PLCM office sales contest….  On PCARD place NYC PLCM Q3 Sales Incentive Contest[.]"  At

27   Miller's direction, his assistant charged $576.20 to her P-Card for two tickets to the show, and

28   submitted the expense for reimbursement with the description that Miller had provided.

29.     But Miller's description of the expense was false, as he again used the tickets to attend the theatre with his girlfriend, and did not give them away to Polycom's New York sales team or anyone else.

30.     Indeed, Miller's August 3, 2012 night out with his girlfriend in New York cost Polycom more than $1,000.  In addition to the tickets, Miller charged more than $275 to his Polycom credit card for post-theatre dinner and later, although he had eaten alone with his girlfriend, emailed his administrative assistant a bogus business description for the meal, including the names of purported attendees from a Polycom customer.  Miller also directed his administrative assistant to book a limousine service to take him to the theatre and dinner, for which she charged more than $160 on her P-Card, at his direction, and obtained reimbursement from Polycom.

31.     In another instance, in June 2012, Miller directed his administrative assistant to hire a custom indoor gardening service to deliver, install and service a series of plants for his personal residence in San Francisco, California.  On June 9, 2012, Miller emailed his assistant and instructed her: "Go ahead and buy the plants, put on your PCARD.  Split the purchases on the card to around $250 per transaction.  I will then take the plants to SF once we move in."  Following Miller's instruction, his assistant charged more than $5,000 to her P-Card for the plants, including charges for a monthly watering service.  Also as Miller had instructed, his assistant split the charges into $250 increments and submitted the expenses for reimbursement with a description indicating that the plants were for Polycom's San Francisco office.

32.     But Miller's description of the expense was false, as he never brought the plants to Polycom's San Francisco office or anywhere else.

33.     In another set of instances, from 2011 to 2012, Miller directed his administrative assistants to charge at least $5,000 worth of hotel and spa gift certificates to their P-Cards, for which he provided them false business descriptions, including the names of purported recipients whom he never actually gave the certificates.

34.     In another set of instances, from 2010 to 2013, Miller directed his administrative assistants to charge at least $10,000 worth of baseball and football game tickets to their P-Cards, for

1  which he provided them with false business descriptions, including the names of purported business

2  guests whom he never actually took to the games.

3        35.    In another set of instances, from 2010 to 2013, Miller directed his administrative

4  assistants to book dozens of limousine rides for his girlfriend and family members, costing at least

5  $2,000, and to charge the rides to the assistants' P-Cards. Many of these limousine rides were to

6  transport his girlfriend to and from the airport during visits to see Miller. In some of these instances,

7  Miller specifically instructed his assistants to list him as the passenger, even though that was false.

8  Miller approved the charges for reimbursement as business expenses even though he knew they were

9  his own personal expenses.

10        36.    The above represent examples of numerous personal expenses that Miller charged to

11  his Polycom credit card or his administrative assistants' P-Cards and then submitted for

12  reimbursement with fake business descriptions. In total, from 2010 to July 19, 2013, when Miller

13  resigned from Polycom, in hundreds of transactions ranging in price from as little as $2.70 to $3,000,

14  Miller charged Polycom for at least $93,000 in personal expenses through reimbursements to his

15  Polycom credit card and his administrative assistants' P-Cards. Miller incurred approximately half of

16  these charges in 2012 alone. Notably, from 2010 to 2012, Miller charged more than $10,000 to his

17  Polycom credit card for personal clothing and accessories.

18        37.    Miller also charged Polycom for his personal air travel, which was paid for directly by

19  Polycom. Miller charged Polycom both for trips that were wholly personal, and for personal trips

20  added to business trips. In each instance, Miller failed to reimburse Polycom for the cost of his

21  personal air travel, in contravention of Polycom's Travel and Expense Reimbursement Policy. As

22  Miller knew, he was able to incur these personal charges without oversight by others, since Polycom

23  allowed flights to be booked without entering a business description.

24        38.    From 2011 to July 19, 2013, Miller thus charged Polycom for at least approximately

25  11 roundtrip flights that were personal in nature, costing Polycom more than $16,000, and forty

26  additional personal air trips that were added onto other business trips.

27        39.    For example, in 2012, Miller charged Polycom for at least five roundtrip flights from

28  San Francisco, California to Florida, where his girlfriend lived, without any business justification.

40.     In two other instances, Miller charged Polycom for a roundtrip flight from San Francisco, California to Reno, Nevada in July 2012, and he charged Polycom for a roundtrip flight from San Francisco to Washington, D.C. in September 2012.  Neither the trip to Reno nor the trip to Washington, D.C. was taken for a business purpose.

41.     As a result of Miller's scheme, he and Polycom omitted at least $109,000 of his perks, charged to his Polycom credit card, his assistants' P-Cards, and on air travel, from Polycom's compensation disclosures to investors.

**B.      Miller Misuses Polycom's Sales Incentive Program for Additional Personal Travel and Other Perks**

42.     In addition to his regular and frequent abuse of Polycom's expense reporting process, Miller obtained and concealed significant additional perks in connection with the company's "CEO Circle" award program.  The CEO Circle was an annual incentive trip that Polycom offered to its top performing sales people.  Qualifiers were invited to attend five-night retreats in exotic foreign resort destinations.  Miller, as CEO, attended and hosted the retreats.

43.     Although Polycom employed an in-house event planner, in anticipation of the 2011 and 2012 CEO Circle events, Miller hired a New Jersey-based event-planning company (the "Event Company") to take the lead in planning and running the CEO Circle trips.  Miller had worked with the Event Company at his previous firm, and had become friendly with its owner.  Miller negotiated directly with the Event Company, and personally reviewed its budgets and invoices.

44.     In July 2011, Miller used Polycom funds to pay for a nine-night trip to Bali, Indonesia for himself and several friends, including a co-worker and his wife, as well as the Event Company owner and his wife.  The cost of the trip, including nearly $16,000 of Miller's own expenses, was included in the Event Company's budget for the April 2012 CEO Circle Program, which was planned to take place in Bali.  Miller's July 2011 trip was described in the budget as a purported "site inspection."

45.     During the July 2011 Bali trip, Miller and his friends enjoyed a full mock-up of the planned 2012 CEO Circle program itinerary, plus two "free" days, and additional activities, entertainment and sightseeing.

46.     Miller insisted that his Bali trip be kept a secret from Polycom, instructing the Event Company personnel not to discuss it with anyone at Polycom other than Miller or his assistant.

47.     Miller also told Polycom's own internal event planner, who had access to the budget, that he was conducting the "site inspection" himself because he had other business in the area. Miller's explanation was false.

48.     In April 2012, Miller attended the CEO Circle event in Bali as host, and brought his girlfriend with him at Polycom's expense.  While there, Miller and his girlfriend charged at least $6,000 in spa treatments and other "incidentals," and took an overnight side-trip to a nearby resort, all at Polycom's expense.

49.     Shortly after the Bali event, on May 2012, Miller began planning another "site inspection," this time with his girlfriend, in anticipation of the 2013 CEO Circle program, which was planned to take place in South Africa.

50.     On June 6, 2012, Miller wrote the Event Company owner to address both his personal expenses from the Bali trip, the bill for which was still being finalized, and his upcoming trip to Africa.  For the Bali expenses, Miller instructed him to:  "Bury all my incidentals from Bali into the bigger picture."  For the upcoming South Africa trip, Miller instructed him to: "Bury the cost of the preview trip, halve [sic] in Bali and then halve [sic] in the Africa budget."  Miller concluded his email by instructing the Event Company that no one other than Polycom's event planner could know about the Africa trip.

51.     To avoid detection, Miller wrote his June 6, 2012 email to the Event Company owner, and others concerning his secret CEO Circle-related travel, from his personal, non-Polycom email account.  Miller had previously instructed the Event Company owner, on May 16, 2012, to "Please use YAHOO for all email re Africa going forward !!!!!!!!!!!!!!"

52.     In August 2012, Miller, Miller's girlfriend and the Event Company owner took a ten-night trip to South Africa that included multiple flights within southern Africa, safaris, and luxury accommodations.  The trip cost Polycom more than $51,000, excluding the Event Company owner's expenses.

53.     Pursuant to Miller's instruction, the Event Company hid more than half of the cost, approximately $27,000, in fake line items in the Bali bill, and the rest in the budget for the South Africa CEO Circle event.  Later, Miller asked the Event Company to send him an accurate bill for his review, and directed the Event Company to send the falsified version to Polycom's event planner.

54.     At the South Africa CEO Circle event that took place in May 2013, Miller again used Polycom funds to pay for additional personal expenses.  For example, Miller and his girlfriend took a one-night side trip to South Africa's wine country, costing Polycom approximately $2,500, and at the end of the program Miller took his girlfriend on a two-night "extension" trip to Zambia.  Miller's and his girlfriend's additional personal expenses from that trip cost more than $5,500.  These costs were included in the larger budget that Miller approved and Polycom paid.

55.     In total, Polycom paid at least $81,000 for Miller and his girlfriend to go on purported "site inspections" to Bali and South Africa and to enjoy personal side trips, spa treatments, and other "incidentals" during the CEO Circle events.  As a result of Miller's conduct, none of these additional perks were disclosed to investors.

**C.     Miller Evades Polycom's Internal Controls and Falsifies Books and Records**

56.     Polycom's Code of Business Ethics and Conduct ("Code of Conduct") required, among other things, that employees submit accurate expense reports and accurately describe the nature of transactions in the company's books and records.  The Code of Conduct also prohibited Polycom employees from using Polycom funds for expenses other than business expenses, and from making false entries in Polycom's books and records.  In June 2009, upon joining the company, Miller certified that he had read, understood, and agreed to comply with Polycom's Code of Conduct.

57.     Polycom's Travel and Expense Reimbursement Policy required, among other things, that employees book the "lowest logical fare" for their air travel; that employees disclose and pay for the incremental cost of any personal portion of a business trip, including stopovers; and that employees submit detailed receipts for meals, entertainment and hotel charges.  As CEO, Miller personally reviewed and revised Polycom's Travel and Expense Reimbursement Policy to impose stricter controls on travel and expenditures.  Indeed, in a "CEO Update" issued by Miller in July 2010, Miller announced a policy to "[d]rink our own champagne" and reduce travel expenses by

1    using Polycom's communication technology "in place of travel for all but customer-facing and

2    revenue-generating interactions." Polycom's Procurement Card Policy also prohibited employees

3    from using P-Cards for anything other than company expenses.

4          58.      In order to evade and circumvent these controls, Miller created and submitted false

5    expense reports and other records, or directed others to do so, and further hid his personal expenses

6    by, among other things, directing his administrative assistants to charge his personal expenses on

7    their P-Cards, which he approved, and to break up certain charges into smaller increments to avoid

8    detection by others.

9          59.      Miller also falsified, or caused others to falsify, Polycom's books and records which,

10   as a result of his conduct, falsely reflected his personal charges as business expenses and included

11   false descriptions and business justifications.

12          **D.**      **Miller Knowingly Misleads Polycom Investors**

13          60.      As Miller knew, Polycom reported annually the compensation paid to its top

14   executives and board members, such as Miller. As Miller also knew, the annual compensation

15   disclosures were the principal subject of Polycom's annual proxy statements, which described

16   important information for shareholders in advance of the annual shareholder meeting, including

17   details about his salary, stock options and other forms of his negotiated compensation, as well as all

18   perks and other personal benefits that he obtained during the prior year.

19          61.      Indeed, as a "Named Executive Officer" of Polycom during his entire tenure at the

20   company, Miller was required by Polycom policy to review and sign internal financial reporting

21   questionnaires that included detailed instructions concerning his obligations to report perks and other

22   personal benefits, summarized the rules requiring the disclosure of perks, and listed examples of

23   reportable perks such as personal travel. The financial reporting questionnaires expressly advised

24   that "it is important to approach the subject of perks and personal benefits thoughtfully. The SEC has

25   taken action in circumstances where perks were not properly disclosed."

26          62.      On March 14, 2010 (for the fiscal year 2009), March 3, 2011 (for the fiscal year

27   2010), March 1, 2012 (for the fiscal year 2011) and March 24, 2013 (for the fiscal year 2012), Miller

28   signed Polycom financial reporting questionnaires, in which he omitted from his responses the perks

1   that he had obtained during the period covered in the questionnaire.  Miller provided these false and

2   misleading responses knowing that the false information therein would be used in preparing

3   Polycom's proxy statements and annual reports filed with the Commission.

4      63. In addition, Miller was specifically alerted to his perk-disclosure obligations by

5   Polycom's CFO in June 2011.  In that incident, Polycom employees discovered that Miller had

6   expensed more than $800 worth of spa gift cards as purported gifts to Polycom employees, but that

7   Miller had actually used the gift cards, at least in part, for himself.  In response, Polycom's CFO

8   raised the issue directly with Miller and suggested a system for further review of Miller's expense

9   reports to avoid problems in the future.  Miller reacted angrily at being second-guessed.  On June 26,

10  2011, the CFO sent Miller an email emphasizing the importance of Miller's and the company's

11  disclosure obligations, including a detailed description of the relationship between Miller's expenses,

12  rules requiring that Polycom disclose all perks he received, and the company's proxy statements.

13     64. Notwithstanding the clear instructions provided in Polycom's annual financial

14  reporting questionnaires, which Miller signed, and the CFO's personal explanation in June 2011,

15  Miller continued to charge and hide personal expenses from Polycom.  Miller knew, or was reckless

16  in not knowing, that his conduct would mislead investors.

17    **E.**  **Miller Causes Polycom to Make False and Misleading Filings**

18     65. As a director of Polycom, Miller solicited proxies from investors for annual meetings in

19  2011, 2012 and 2013, all of which annual proxy statements he knew to be false and misleading.

20     66. As the President and CEO of Polycom, Miller also signed and certified the company's

21  annual reports on Forms 10-K for the fiscal years 2010, 2011 and 2012 (filed in 2011, 2012 and

22  2013).  As Miller knew, each of those annual reports incorporated by reference, on a prospective

23  basis, portions of Polycom's proxy statements for the upcoming annual meeting of stockholders,

24  including the company's compensation disclosures.

25     67. On April 13, 2011, Polycom filed its definitive proxy statement on Form DEF 14A for

26  the fiscal year 2010.  In that filing, Polycom reported that Miller had received $4,341,868 in total

27  compensation, including $111,493 in perks ($162,215 in "All Other Compensation," which included

28  non-perk 401(k) plan contributions and tax gross-ups).  Of those perks, $107,918 consisted of relocation

1   expenses that Miller incurred pursuant to his offer letter from the company.  Polycom only reported that

2   Miller received one "token gift," valued at $125, and it did not report having paid for any of Miller's

3   personal meals, travel or entertainment.  Miller signed the April 13, 2011 Form DEF 14A and personally

4   used it to solicit proxy votes for Polycom's annual shareholder meeting.  Miller also signed Polycom's

5   annual report on Form 10-K, filed on February 18, 2011, which incorporated the proxy statement by

6   reference.  The 2010 proxy statement was materially false and misleading, as it omitted at least $15,435

7   of Miller's undisclosed perks.

8          68.    On April 9, 2012, Polycom filed its definitive proxy statement on Form DEF 14A for the

9   fiscal year 2011.  In that filing, Polycom reported that Miller had received $5,016,646 in total

10  compensation, including $112,998 in perks ($175,967 in "All Other Compensation," which included

11  non-perk 401(k) plan contributions).  Of those perks, $106,623 consisted of additional relocation

12  expenses that Miller incurred pursuant to his offer letter from the company.  Polycom did not report

13  having paid for any of Miller's personal items, meals, travel or entertainment.  Miller signed the April 9,

14  2012 Form DEF 14A and personally used it to solicit proxy votes for Polycom's annual shareholder

15  meeting.  Miller also signed Polycom's annual report on Form 10-K, filed on February 17, 2012, which

16  incorporated the proxy statement by reference.  The 2011 proxy statement was materially false and

17  misleading, as it omitted at least $28,478 of Miller's undisclosed perks.

18         69.    On April 19, 2013, Polycom filed its definitive proxy statement on Form DEF 14A for

19  the fiscal year 2012.  In that filing, Polycom reported that Miller had received $7,356,905 in total

20  compensation, including $31,430 in perks ($33,430 in "All Other Compensation," which included non-

21  perk 401(k) plan contributions and tax gross-ups).  Of those perks, $21,430 consisted of final relocation

22  expenses that Miller incurred pursuant to his offer letter from the company.  Polycom did not report

23  having paid for any of Miller's personal items, meals, travel or entertainment.  Miller signed the April

24  19, 2013 Form DEF 14A and personally used it to solicit proxy votes for Polycom's annual shareholder

25  meeting.  Miller also signed Polycom's annual report on Form 10-K, filed on February 14, 2013, which

26  incorporated the proxy statement by reference.  The 2012 proxy statement was materially false and

27  misleading, as it omitted at least $115,683 of his undisclosed perks.

28

70.     Polycom's April 19, 2013 proxy statement specifically highlighted perks as a metric of its corporate governance and pay-for-performance goals, stating that it provided "**No Excessive Perquisites**" (emphasis in original) and explaining that "[a] small amount of perquisites are provided to our executives, consistent with the practices of our peer companies."  This statement, itself, was materially false and misleading, as Miller had engaged and was still engaging in a scheme to obtain and hide tens of thousands of dollars' worth of perks and other personal benefits from Polycom.

71.     On April 25, 2014, Polycom filed its definitive proxy statement on Form DEF 14A for the fiscal year 2013.  In that filing, Polycom reported that Miller had received $7,682,509 in total compensation, including $5,180 in perks ($544,342 in "All Other Compensation," which included non-perk 401(k) plan contributions and a severance package).  This amount excluded at least $30,474 in undisclosed perks that Miller had obtained in 2013 before his resignation.  In its notes to the company's 2013 executive compensation disclosures, and referring to an internal review by advisors to Polycom's Audit Committee, Polycom stated that "[i]n part because of Mr. Miller's submission of false information concerning expenses, Polycom cannot determine the precise amount of personal expenses that Mr. Miller improperly submitted as business expenses or that the sample of expenses tested by the advisors included all improperly submitted expenses."

72.     As a result of Miller's conduct, and as Miller knew, Polycom omitted from its compensation disclosures at least the following amounts of Miller's personal expenses, by fiscal year: approximately $15,435 in 2010; approximately $28,478 in 2011; approximately $115,683 in 2012; and approximately $30,474 in 2013.  As a result of Miller's conduct, and as Miller knew, Polycom also omitted from its disclosures any description of the nature of the personal expenses that Miller had obtained or the manner in which he obtained them.

73.     Pursuant to Exchange Act Rule 13a-14, in each of Polycom's annual reports on Form 10-K for the fiscal years 2010 through 2012, and in each of Polycom's quarterly reports on Form 10-Q filed on July 30, 2010, November 2, 2010, April 28, 2011, August 2, 2011, October 31, 2011, May 1, 2012, August 1, 2012, October 31, 2012 and April 30, 2013, Miller certified that, among other things, he had designed disclosure controls and procedures to ensure that material information relating to the company would be made known to management, and that he that he had

1    disclosed to Polycom's board of directors and its auditors "[a]ny fraud, whether or not material, that
2    involves management…" But these statements were false and misleading, as Miller had evaded
3    Polycom's controls, hidden his own conduct from the company's CFO and other officers, and had not
4    disclosed to Polycom's board, its auditors, or to anyone else that he was engaged in his own
5    fraudulent scheme to obtain and hide perks and other personal benefits from the company.

6    74.    On July 12, 2011, November 4, 2011 and June 13, 2013, Miller signed registration
7    statements filed with the Commission on Forms S-8, each of which registered offerings of Polycom
8    stock previously reserved for issuances pursuant to employee stock purchase and equity incentive plans.
9    Each of the registration statements incorporated Polycom's previously-filed annual report which, in turn,
10   incorporated the company's proxy statements. Accordingly, these registration statements filed by
11   Polycom were also false and misleading.

12   75.    Miller knew, or was reckless in not knowing, that by falsifying corporate records to
13   hide his personal expenses he was misleading investors and violating the Commission's executive
14   compensation disclosure rules and regulations. Furthermore, even though he knew from at least
15   April 2011 until his resignation on July 19, 2013 that his and Polycom's prior statements about his
16   compensation were false and misleading, Miller never corrected any of these misstatements nor
17   disclosed any other information necessary to make them accurate and complete.

18   **F.    Miller's Expense Abuse Scheme Is Uncovered**

19   76.    In May 2013, Polycom learned that Miller had been using Polycom funds to pay for
20   personal expenses, and that he had submitted false expense reports with fabricated business descriptions
21   in order to obtain reimbursement for such expenses.

22   77.    In July 2013, following an internal investigation, Polycom's Audit Committee confronted
23   Miller with the allegations, including specific examples of personal expenses that he had submitted with
24   false business descriptions. During an interview conducted by the Audit Committee's outside counsel,
25   Miller acknowledged that certain of the expenses were personal, that he had submitted them with false
26   business descriptions, and that his conduct was inappropriate.

27   78.    On July 19, 2013, Miller tendered his resignation as CEO and as a board member, which
28   Polycom accepted. On July 23, 2013, Polycom announced publicly that the company had found certain

1  irregularities in Miller's expense submissions, for which Miller had accepted responsibility, and that

2  Miller had resigned.

3       79.     As a result of Miller's falsification of corporate records and his efforts to conceal the

4  personal nature of his expenses, as alleged herein, despite diligence, the Commission did not have

5  reason to question the accuracy Polycom's statements about Miller's compensation or perks.

6       80.     During the Commission's investigation preceding the filing of this Complaint, Miller

7  asserted his Fifth Amendment privilege against self-incrimination when asked questions about his

8  expense report submissions, reimbursement by Polycom for personal charges, and Polycom's

9  executive compensation disclosures.

10      **G.    Miller Profits from Polycom Stock Sales**

11      81.     On January 26, 2012, Miller sold approximately 80,000 shares of Polycom common

12  stock at a weighted average price of approximately $20.68 per share.  In this transaction, Miller sold

13  securities, through the public securities markets, that had originally been issued to him as part of his

14  compensation by Polycom.

15      82.     On February 15, 2012, Miller sold approximately 30,000 shares of Polycom common

16  stock at a price of approximately $21.80 per share.  In this transaction, Miller sold securities, through

17  the public securities markets, that had originally been issued to him as part of his compensation by

18  Polycom.

19      83.     On at least four additional occasions from May 2011 to February 2012, Miller

20  disposed of Polycom common stock, in order to pay the exercise price or tax liability incident to the

21  receipt, exercise or vesting of Polycom securities.  In each of these transactions, Miller disposed of

22  securities, through the public securities markets, that had originally been issued to him as part of his

23  compensation by Polycom.

24      84.     In each of the above-described transactions, Miller obtained either securities or cash.

25  In obtaining these securities or cash, Miller omitted material facts, including his misuse of Polycom

26  funds for personal expenses and the true amount of perks that he received from Polycom.  Miller's

27  omissions also caused factual statements made by Polycom and by Miller in Commission filings, as

28  set forth below and in other allegations in the Complaint, to be materially misleading.

COMPLAINT                                    17

85.     Material facts relating to the above-described transactions were set forth in descriptions that were publicly-filed with the Commission by Miller and by Polycom between May 2011 and February 2012, including in Forms 4 (statements of changes in beneficial ownership) filed by or on behalf of Miller, in definitive proxy statements filed by or on behalf of Polycom and in Polycom proxy materials provided to shareholders.  Among those facts were descriptions of the amounts of securities obtained by Miller, other compensation also awarded to Miller such as cash compensation and perks, the means by which Miller sold the securities and the timing of vesting of certain securities, all of which were rendered materially misleading due to Miller's undisclosed personal expense reimbursements received before and during such sales.

# FIRST CLAIM FOR RELIEF

## Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
## (Securities Fraud)

86.     The Commission realleges and incorporates by reference paragraphs 1 through 85, as though fully set forth herein.

87.     By virtue of the foregoing, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, and with scienter: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

88.     By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 15 U.S.C. § 240.10b-5.

# SECOND CLAIM FOR RELIEF

## Violations of Sections 17(a)(1), (2), and (3) of the Securities Act
## (Securities Fraud)

89.     The Commission realleges and incorporates by reference paragraphs 1 through 85, as though fully set forth herein.

90.     By virtue of the foregoing, Defendant, directly or indirectly, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange: (a) with scienter, employed devices, schemes or artifices to defraud; (b) with scienter or negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) with scienter or negligence engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of the securities being offered or sold.

91.     By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will again violate, Sections 17(a)(1), (2), and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), (2), & (3).

## THIRD CLAIM FOR RELIEF

**Violations, and Aiding and Abetting Violations, of Section 14(a)
of the Exchange Act and Exchange Act Rules 14a-3 and 14a-9
(False and Misleading Proxy Statements)**

92.     The Commission realleges and incorporates by reference paragraphs 1 through 85, as though fully set forth herein.

93.     By virtue of the foregoing, Defendant, directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce or of any facility of a national securities exchange or otherwise, solicited and permitted the use of his name to solicit proxies with respect to securities issued by Polycom and registered with the Commission, in contravention of Rules 14a-3 and 14a-9 thereunder, which prohibit solicitation of proxies without required information or with proxy statements that contain any false or misleading statement as to any material fact, or that omit any material fact necessary to make the statements made not false or misleading.

94.     By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will again violate, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rules 14a-3 and 14a-9 thereunder, 15 U.S.C. §§ 240.14a-3 & 240.14a-9.

95.     By virtue of the foregoing, Polycom, directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce or of any facility of a national securities exchange or otherwise, solicited and permitted the use of its name to solicit, proxies with respect to securities issued by Polycom and registered with the Commission, in contravention of Rules 14a-3 and 14a-9 thereunder, which prohibit solicitation of proxies without required information or with proxy statements that contain any false or misleading statement as to any material fact, or that omit any material fact necessary to make the statements made not false or misleading, in violation of Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9.

96.     By virtue of the foregoing, Defendant knowingly provided substantial assistance to Polycom's violations of Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9.  Defendant therefore aided and abetted violations of, and unless restrained and enjoined will continue to aid and

1  abet violations of, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rules 14a-3 and 14a-9

2  thereunder, 15 U.S.C. §§ 240.14a-3 & 240.14a-9.

3                                  **FOURTH CLAIM FOR RELIEF**

4                **Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act**
                                    **(False Books and Records)**
5

6          97.      The Commission realleges and incorporates by reference paragraphs 1 through 85, as

7  though fully set forth herein.

8          98.      By virtue of the foregoing, Polycom failed to make and keep books, records, and

9  accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of

10  its assets, in violation of Section 13(b)(2)(A) of the Exchange Act.

11          99.      By virtue of the foregoing, Defendant knowingly provided substantial assistance to

12  Polycom's failure to make and keep books, records, and accounts which, in reasonable detail,

13  accurately and fairly reflect its transactions and dispositions of its assets.

14          100.     By virtue of the foregoing, Defendant aided and abetted violations of, and unless

15  restrained and enjoined will again aid and abet violations of, Section 13(b)(2)(A) of the Exchange

16  Act [15 U.S.C. § 78m(b)(2)(A)].

17                                   **FIFTH CLAIM FOR RELIEF**

18              **Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1**
                **(Falsifying Books and Records and Circumventing Internal Controls)**
19

20          101.     The Commission realleges and incorporates by reference paragraphs 1 through 85, as

21  though fully set forth herein.

22          102.     By virtue of the foregoing, Defendant knowingly circumvented a system of internal

23  accounting controls, and knowingly falsified books, records and/or accounts required to be made and

24  kept by Section 12(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2).

25          103.     By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will

26  again violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5).

27

28

104.    By virtue of the foregoing, Defendant directly or indirectly, falsified or caused to be falsified, books, records and/or accounts Polycom was required to make and keep pursuant to Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2).

105.    By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 13(a)
### of the Exchange Act and Exchange Act Rules 12b-20 and 13a-1
### (False SEC Reports)

106.    The Commission realleges and incorporates by reference paragraphs 1 through 85, as though fully set forth herein.

107.    By virtue of the foregoing, Polycom filed with the Commission annual reports that contained misleading information, and failed to include material information that was necessary to make the required statements not misleading, in violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a) and Rules 12b-20 and 13a-1 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-1.

108.    By virtue of the foregoing, Defendant knowingly provided substantial assistance to Polycom's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1. Defendant therefore aided and abetted violations of, and unless restrained and enjoined will again aid and abet violations of, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a) and Rules 12b-20 and 13a-1 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-1.

## SEVENTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13a-14
### (False Certifications)

109.    The Commission realleges and incorporates by reference paragraphs 1 through 85, as though fully set forth herein.

110.    Defendant signed certifications that were required to be made pursuant to Rule 13a-14 of the Exchange Act and that were included in Polycom's filings, which were false or misleading when made.

111.    By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Permanently restrain and enjoin Defendant from directly or indirectly engaging in the transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rules 14a-3 and 14a-9, 17 C.F.R. §§ 240.14-3 & 240.14-9; Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rules 13b2-1 and 13a-14, 17 C.F.R. §§ 240.13b2-1 & 240.13a-14; and Sections 13(a) and 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §§ 78m(a) & 78m(b)(2), and Rules 12b-20 and 13a-1, 17 C.F.R. §§ 240.12b-20 & 240.13a-1.

### II.

Enter an order barring Defendant from serving as an officer or as a director of a public company pursuant to Section 20(e) of the Securities Act, 15 § U.S.C. 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

### III.

Enter an Order requiring Defendant to disgorge his ill-gotten gains according to proof, plus prejudgment interest thereon.

### IV.

Enter an Order requiring Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

1   may be entered, or to entertain any suitable application or motion for additional relief within the

2   jurisdiction of this Court.

3                                              VI.

4          Grant such other and further relief as this Court may determine to be just, equitable, and

5   necessary.

6                                   **<u>JURY TRIAL DEMAND</u>**

7          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury

8   trial on the issue of Defendant's liability for violations of the federal securities laws.

9          .

10  Dated:  March 31, 2015                    Respectfully submitted,

11

12                                            <u>/s/ David A. Berman</u>
                                              DAVID A. BERMAN
13                                            SUSAN F. LA MARCA
                                              DAVID S. JOHNSON
14                                            Attorneys for Plaintiff
                                              SECURITIES AND EXCHANGE
15                                            COMMISSION

16

17

18

19

20

21

22

23

24

25

26

27

28